## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

CARGAIL T. DOWNER,

    Plaintiff,

v.

                                Civil No. 21-1618-BAH

PRINCE GEORGE'S COUNTY
BOARD OF EDUCATION,

    Defendant.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### MEMORANDUM OPINION

Plaintiff Cargail Downer ("Plaintiff") brought suit against Defendant Prince George's County Board of Education ("Defendant") alleging county, state, and federal employment discrimination claims.[1] ECF 1, at 1 ¶ 1. Pending before the Court is Defendant's motion for summary judgment (the "Motion"). ECF 67. Plaintiff filed an opposition, ECF 71, and Defendant filed a reply, ECF 72. All filings include memoranda of law and exhibits.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendant's Motion is **GRANTED**.

## I.    BACKGROUND

Plaintiff "is a black person and a native of Guyana, South America[]." ECF 67-1 (Statement of Undisputed Fact), at 2 ¶ 2. Plaintiff was hired by Defendant on March 26, 2018, as

---

[1] Plaintiff's suit was incorrectly brought against "Prince George's County Public Schools," though the parties agree that the correct Defendant is Plaintiff's employer, Prince George's County Board of Education. *See* ECF 67-1, at 2 ¶ 1; ECF 72, at 1 n.1; ECF 71, at 6.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

an HVAC Mechanic I. *Id.* As an HVAC Mechanic I, Plaintiff's position was within a bargaining unit covered by a Collective Bargaining Agreement ("CBA") between Defendant and their affiliated labor unions (ACE/AFSCME Local 2250, AFL-CIO). ECF 73-1 (Downer Deposition), at 11, 42:2–20; ECF 73-7 (Carpenter Declaration), at 1 ¶ 3; *see also* ECF 73-7 (Negotiated Contract), at 4–86.

As an HVAC Mechanic I, Plaintiff worked in a department known as the "900 Shop." ECF 67-1, at 2 ¶ 2. The 900 Shop services HVAC systems, plumbing, and boilers at Defendant's facilities. *Id.* The Master Foreman of the 900 Shop was Lance Schiemer (Caucasian American). ECF 74-3 (Schiemer Declaration), at 1 ¶ 2; ECF 67-1, at 2 ¶ 3.

A.    **Plaintiff's Complaints of Discrimination**

Plaintiff submitted several complaints throughout his employment alleging discrimination. Plaintiff first submitted an internal Discrimination/Harassment Incident Report, known as a 4170 complaint, on October 14, 2019, following an incident that occurred on September 30, 2019. ECF 73-1, at 174. In this incident, Garth Deitzer (Caucasian American), Shop Lead, informed Plaintiff of a change in his work assignment. ECF 73-1, at 24, 93:18-94:8. Mr. Deitzer allegedly told Plaintiff he was not going "to do more AC work," and instead was going to "do[] exhaust fans on the roof." *Id.* at 94:1–2. Plaintiff construed this action to be a demotion and perceived management to have "taken away" the schools that had been assigned to him. ECF 1, at 5 ¶ 26 (tense altered); *id.* at 8 ¶ 39; ECF 73-1, at 24, 93:1–11; ECF 73-13 (Downer Declaration), at 2 ¶ 9. Plaintiff claimed in his internal complaint that he was: (1) denied overtime; (2) denied training; (3) denied job assistance; and (4) wrongfully demoted. *Id.* at 174–75. However, the complaint failed to identify Plaintiff's race or national origin as the basis of the alleged discrimination. *Id.*

2

Amana Simmons, PGCPS' Equal Employment Opportunity Officer, subsequently began an investigation into the allegations. *See* ECF 74-1, at 5 (indicating Ms. Simmons met with Plaintiff on November 5, 2019, and investigated). While the investigation was ongoing, on February 10, 2020, Plaintiff filed another internal complaint alleging harassment, retaliation, and hostile work environment based upon his receipt of "corrective actions." ECF 73-1, at 35–36, 140:19–141:16; ECF 73-1, at 212–16. Corrective actions are documents that "are not intended to be disciplinary, but rather [are intended] to provide an employee with notice of a performance or behavioral deficiency and give them an opportunity to appropriately modify their behavior or performance." ECF 74-1 (Response of Prince George's County Public Schools to Plaintiff's EEOC charge), at 6.

In Plaintiff's February 2020 complaint he again failed to mention his race or national origin as a basis for the alleged harassment. *See* ECF 73-1, at 212–16. Plaintiff filed this internal complaint on February 10, 2020, after he received numerous corrective actions. *Id.* He received corrective actions on January 23, 2020, and January 27, 2020. *See* ECF 73-1, at 212–16 (February 2020 Complaint); ECF 74-1, at 5; ECF 74-1 (January 23, 2020 Corrective Action), at 51–52 (indicating Plaintiff was to receive professional counseling for "incompetency" related to Plaintiff's response to an emergency call for a leak in a gym at Robert Goddard school); ECF 74-1 (January 27, 2020 Corrective Action), at 53–54 (indicating Plaintiff was to receive a reprimand for "insubordination" for failing to respond to an emergency call for heat repair at Bradbury Heights).[3]

---

[3] Plaintiff asserts that the dispatcher miscommunicated the location of the issue and told him to report to Roger Heights. ECF 73-1, at 215–16. The following day, Plaintiff discovered the ticket for Bradbury Heights and believing it was a new ticket, went to fix the problem. *Id.* Plaintiff alleges the dispatcher admitted she may have misspoken on the radio. *Id.*

Plaintiff's next complaint came in August 2020, when Plaintiff initiated an Equal Employment Opportunity Commission ("EEOC") Charge, after a confrontation with his co-worker resulted in a change to his shift-assignment. ECF 73-1, at 232. On August 20, 2020, Plaintiff confronted his co-worker, James Howell (Caucasian American), for Mr. Howell's failure to wear a mask on school property according to PGCPS' Covid-related restrictions. ECF 73-1, at 44–45, 174:7–178:6; ECF 73-1, at 236–37. Plaintiff alleged that Mr. Howell responded by saying, "the next time you say something to me about a mask I'm going to put a bullet in your fucking head and get you out of here!" ECF 73-1, at 236–37 (including a summary of the incident in an email and attaching a picture of him being confronted by Mr. Howell); ECF 73-1, at 45, 177:19-178:7.

Plaintiff reported the incident with Mr. Howell internally, *see* ECF 73-1, at 236–37, obtained a temporary peace order against Mr. Howell from a Maryland state court, and notified PGCPS about the peace order, *see* ECF 73-1 (Temporary Peace Order), at 240; *id.* (Petition for Peace Order), at 242–43. To comply with the peace order, PGCPS officials determined they would need to separate Plaintiff and Mr. Howell. *See* ECF 73-1, at 246–47 (including email from Plaintiff about separation to Mr. Fossett); ECF 73-3, at 20–21, 80s:1-81:11 (indicating Mr. Schiemer was "given direction from [his] superiors to separate Mr. Howell and [Plaintiff]").

At the time of the incident, the 900 Shop was already divided into "A" and "B" shifts to minimize the number of employees working at one time as a Covid precaution. *See* ECF 73-1, at 223–26. Both Plaintiff and Mr. Howell were originally placed on the A shift. *Id.* at 224. After Mr. Schiemer was directed to separate Mr. Howell and Plaintiff, Mr. Schiemer elected to place

Plaintiff on the "B" shift.[4] ECF 73-1, at 47, 185:8-12; at 48, 189:6-190:18. Mr. Schiemer testified that the decision to move Plaintiff, as opposed to Mr. Howell, to B shift, was based on a desire to keep an equal balance of specialized refrigeration mechanics on both the A and B shift. ECF 73-3, at 22, 86:8-14 ("So in splitting the shops up, I had to make sure I had coverage for all aspects of my shop. So that's how the determination was come about for all my different guys, what shift they would be on."). Mr. Schiemer testified the school system had 230 facilities and the 900 Shop only had six mechanics that specialized in refrigeration mechanics. ECF 73-3, at 22, 88:13-18. Mr. Howell was one of the six refrigeration mechanics. *Id.* at 23, 89:4-5. Mr. Schiemer had previously scheduled "three refrigeration mechanics on the A shift and three refrigeration mechanics on the B shift. That way [he] had equal coverage." *Id.* 90:1-5. Thus, when Mr. Howell and Plaintiff needed to be separated, Mr. Schiemer decided that Plaintiff would be moved to the B shift so that he did not have to move Mr. Howell and "make it unbalanced." *Id.* 89:22-90:11.

In Plaintiff's August 20, 2020, EEOC charge, plaintiff alleged race and national origin discrimination, as well as retaliation based on incidents that occurred between June 3, 2019, and May 29, 2020. *See* ECF 73-1, at 232. Plaintiff's charge alleged discrimination with respect to "discipline and harassment" based on his receipt of corrective actions and a low annual performance evaluation. *Id.* PGCPS' internal investigation was still ongoing, and no written determination had yet been issued; but as a result of Plaintiff's EEOC charge, Ms. Simmons properly deferred her investigation to permit the EEOC to investigate. *See* ECF 73-1, at 262.

Regarding Plaintiff's complaints about a lack of training, Plaintiff testifies that specific employees were given access to training that he did not receive; however, the only specific training

---

[4] A and B shifts completed the same type of work, ECF 73-1, at 47, 185:13-15, and had similar schedules. ECF 73-3, at 23, 89:6-17 (indicating the A and B shifts are "both a.m. shifts" with one starting at "6:00 a.m." and the other starting at "7:00 a.m.").

Plaintiff alleges he did not receive was energy management training. ECF 73-1, at 25, 99:17–19. Plaintiff acknowledges that Defendant claims that only Grade 18 mechanics received energy management training, while Plaintiff did not receive it as he was Grade 16, but asserts he was not informed of this policy at the time. ECF 73-13, at 2 ¶ 4.

Regarding Plaintiff's complaints that he was denied job assistance, Plaintiff testified that he did not have an independent contractor assigned to help him, while other people did. ECF 73-1, at 25, 100:18–102:22 (identifying a "clique" of employees that received special treatment, including: Vaughn Diggs, Mr. Deitzer, Donald Canada, Mr. Schiemer, Mario Giron, José Solorzano, Justin Bond, Darrian Crooks, Victor Jones, and Larry Patterson). Plaintiff acknowledges Defendant's claim that independent contractors are assigned to projects, not individuals, but asserts this policy was never communicated to him. ECF 73-13, at 2 ¶ 6; ECF 73-1, at 25–26, 100:12–102:24. Plaintiff does not dispute that on at least one occasion he had an independent contractor help him, ECF 73-1, at 38, 150:2–152:6, rather Plaintiff asserts that those who were part of this clique "received favorable treatment," ECF 73-13, at 2 ¶ 5.

Finally, Regarding Plaintiff's complaint that he was denied overtime, Plaintiff asserts that he received overtime during his first year of employment but that Defendant later "limited or eliminated [his] overtime hours, while white coworkers received overtime hours." ECF 73-13, at 2 ¶ 8; see ECF 73-1, at 25, 98:3–4; *id.* at 27, 105:7–9 (mentioning that Darrian Crooks (Black Jamaican) would get overtime "whenever he wants" and that Ken Redd (African American) worked overtime).

**B.    Defendant's Position on Plaintiff's Unsatisfactory Work Performance**

Defendant asserts that Mr. Schiemer and others noticed Plaintiff's difficulty in receiving constructive feedback early in Plaintiff's employment. ECF 73-3, at 8, 29:11–21. For instance,

6

in an e-mail to Human Resources dated May 17, 2018, almost a year and a half before Plaintiff

first filed an internal complaint, Mr. Schiemer and Mr. Canada requested an extension of Plaintiff's

probationary period and noted that Plaintiff was "very confrontational and appears to be missing

the basic knowledge needed to effectively troubleshoot HVAC units." ECF 74-1, at 23 ("We are

requesting that [Plaintiff's] probationary period be extended.  He has been placed with numerous

employees and they all have the same concerns of him being very confrontational.").

Mr. Schiemer received complaints about Plaintiff from both African American and

Caucasian employees, and from employees of U.S. national origin and foreign national origin,

including: (a) Vaughn Diggs (African American), ECF 74-3, at 87 (indicating a conflict between

Mr. Diggs and Plaintiff during ride sharing, in which Plaintiff had an "attitude" and told Mr. Diggs

to "shut up"); (b) José Solorzano (Hispanic), *id.* at 88 (indicating that Mr. Solorzano and Plaintiff

shared a ride for several months and "the whole time was an argument about how his way was the

right way even thought it was completely wrong" and that his "knowledge of the HVAC field was

not there and [he] would not take criticism at all"); (c) Victor Jones (African American), *id.* at 89

(indicating there have been "several situations where [Plaintiff] and I had a falling out.  He is very

argumentative toward me and his lack of knowledge in the trade makes me unwilling to work with

[Plaintiff]" and noting one time in 2018 when Mr. Jones "felt threatened" by Plaintiff); (d) Darrian

Crooks (Black Jamaican), *id.* at 100 (indicating "on several occasions" Plaintiff demonstrated a

"very aggressive attitude" and on one occasion when Mr. Crooks tried to correct Plaintiff for

installing a valve in the wrong direction, Plaintiff "started to curse as he did throughout that job");

(d) Chad Jensen (Caucasian American), *id.* at 101 (indicating concern about "possibly riding with"

Plaintiff after having "seen multiple instances of him yelling . . . while using horrible profanities"

and because he "felt [Plaintiff] was unstable"); and (e) William Pinkard (Caucasian American), *id.*

7

at 92 (indicating concerns about Plaintiff due to his "multiple issues with other employees and management" and because "around the nation the potential for workplace violence has increased" Mr. Pinkard was concerned about Plaintiff's "hostile attitude [that] is not conducive to a good working environment").

Plaintiff acknowledges having conflicts with Mr. Diggs, Ken Redd (African American), Mr. Howell, and Mr. Jones. ECF 73-1, at 16, 62:17–63:2; *id.* at 18, 69:20–70:17. Plaintiff was informed in his annual performance reviews about his need to improve his work relationship with other employees. *See* ECF 73-1 (June 2018 Evaluation for April 9, 2018–June 30, 2018), at 160 (indicating that Plaintiff "[n]eeds to make sure he has a good working relationship with all coworkers and staff" within the first three months of Plaintiff's employment); ECF 73-1 (2019 Evaluation), at 165 ("I would like to see him work on and improve his work relationships with his [immediate] foremen and leads"); ECF 74-3 (2021 Evaluation), at 95 ("Responds very negatively to constructive criticism. [Plaintiff] does not speak to other employees. All HVAC mechanics have requested him NOT to ride or be paired with them in the vehicle. (His negative, unprofessional and disrespectful attitude contributes to the problem)." (emphasis in original)).

Between June 2019 and January 2021, Plaintiff received several corrective actions concerning his job performance, ranging from verbal counseling to written reprimands: (1) June 4, 2019—a verbal warning for failure to follow supervisor's instructions, ECF 73-1, at 21, 84:11–19; ECF 74-1, at 24–26; (2) June 4, 2019—professional counseling for failure to complete timesheet and work order system correctly, ECF 73-1, at 22, 87:2–7; ECF 73-1, at 171; (3) October 15, 2019—verbal counseling for failure to assist a technician in a procedure known as a valve over procedure, ECF 73-1, at 30, 119:16–20; ECF 74-1, at 27; (4) January 21, 2020—professional counseling for failure to correctly diagnose a problem concerning a leak, ECF 73-1, at 34, 135:3–

10; ECF 74-1, at 51–52; (5) January 23, 2020—written reprimand for failure to respond to an emergency call, ECF 73-1, at 34, 136:3–8; ECF 74-1, at 53–54; (6) January 27, 2020—written reprimand for failing to properly deal with a heating issue at Imagine Morningside Public Charter School, ECF 73-1, at 34, 136:21–137:5; ECF 74-1, at 55–56; (7) January 25, 2021—verbal counseling for failing to record working time in the work order system in a timely fashion, ECF 73-1, at 48, 192:17–22; ECF 73-1, at 248–49; and (8) January 25, 2021—professional counseling for failing to follow the radio policy, ECF 73-1, at 49, 193:10–22; ECF 73-1, at 253–54.  In addition, in January 2020, Plaintiff was identified as part of a traffic citation audit as an individual who needed to pay a traffic citation he received when operating a PGCPS vehicle.  ECF 73-1, at 33–34, 132:7–133:21.  Other employees, both Caucasian American and African American were required to pay their citations as well.  ECF 73-1, at 33–34, 132:7–134:8.

Between approximately March 2021 and June 2021 Plaintiff was on leave recovering from Covid-19.  ECF 73-1, at 51, 201:1–202:1.  When Plaintiff returned in June 2021, Plaintiff was informed that he would need to travel to different PGCPS locations with one of his co-workers instead of traveling in his own vehicle.  *Id.* at 51–52, 202: 15–206:14.  In the 900 Shop, sharing vehicles was common because there were a limited number of vehicles for the technicians, something Plaintiff experienced when he first acquired the HVAC position, *id.* at 16, 61:18–62:22, and which Plaintiff was informed of in his April 2019 performance review, *id.* at 21, 81:15–83:12 (indicating that "sometimes there would be two people working in a truck"); ECF 73-1, at 164, 166 (commenting to Plaintiff in his appraisal review on April 2, 2019, under category "professional behavior" that "I would like to see him work on and improve his work relationship with his intimate foreman and leads.  In this industry and with our equipment you will often have to ride two men to a truck and help each other service our facilities").

Upon learning of the need to ride share upon his return from medical leave, Plaintiff confronted Mr. Schiemer. *Id.* at 51–53, 204:5–209:12. Plaintiff pointed his finger at him, *id.* at 204:17, and "started calling [Mr. Schiemer] derogatory names," ECF 74-3, at 84 ("He was extremely agitated and seemed violent"). When Mr. Schiemer asked if Plaintiff was threatening him Plaintiff responded, "I will get you out of this office." *Id.* Plaintiff acknowledges making a similar statement. ECF 73-1, at 51–52, 204:16–22 ("I did point my finger and said, you are very vindictive, you know, and for what you have done you need to get out of this shop."). Another employee, Jason Pottier, also witnessed this confrontation. ECF 74-3, at 85.

Mr. Schiemer interpreted Plaintiff's statement and mannerism to be threatening, ECF 73-3, at 25, 97:11, and reported this incident to his supervisors, ECF 74-3, at 4 ¶ 11; *id.* at 84 (summarizing the incident in an email from Mr. Schiemer to his supervisors). The report was forwarded to PGCPS's Employee and Labor Relations Office. ECF 73-2, at 52–53. On June 22, 2021, Jeffrey Carpenter (African American), PGCPS's Director of Employee and Labor Relations, placed Plaintiff on a temporary 48-hour administrative leave with pay while this incident was investigated. ECF 73-1, at 54, 214:5–10; ECF 73-2 (Carpenter Deposition), at 8-9, 31:22–33:6; ECF 73-2 (Notification of Administrative Leave), at 50. Then, on June 22, 2021, Plaintiff was placed on administrative leave, with pay, for an indeterminate period, pending resolution of an Employee and Labor Relations Office complaint against Plaintiff. ECF 73-1, at 264–65; ECF 73-2, at 52–53. The alleged conduct was insubordination and inappropriate communication. ECF 73-2, at 52.

On November 9, 2022, Charlene Keller, an Investigator in the PGCPS Department of Safety and Security Services sustained the charge of inappropriate conduct. ECF 74-5, at 138–44. As of the filing of this motion, Plaintiff was still on administrative leave. ECF 67-2, at 17; *see*

*also* ECF 73-12, at 25 (indicating that as of March 10, 2023, Plaintiff was still an active employee and receiving income).[5]  While on administrative leave, Plaintiff has continued to receive his regular pay, benefits, and annual pay raises.  ECF 73-5, at 4, 13:9–14:18; ECF 73-12, at 4–25. Additional facts may be included below, as necessary.

On June 30, 2021, Plaintiff filed suit against Defendant, alleging nineteen counts of violations under federal, state, and county anti-discrimination laws.  ECF 1, at 4–19.  Plaintiff seeks compensatory and punitive damages; "back pay and front pay; loss of promotions; restitution of forfeited employment benefits; [and] other appropriate legal and equitable relief."  *Id.* at 19. Discovery commenced and was thereafter extended numerous times.  *See* ECF 31, 42, 44, 58.  The motion became ripe in September 2023, *see* ECF 73, and the case was transferred to the undersigned in October 2023.

## II.   **LEGAL STANDARD**

### A.   **Summary Judgment**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

---

[5] According to Defendant, Plaintiff remains on paid administrative leave because, pursuant to the CBA as well as the due process rights of public employees, the next step would be to set up a *Loudermill* hearing, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), to determine the final outcome.  ECF 72, at 9 n.4.  However, Plaintiff and his legal and union representatives have allegedly resisted engaging in such a hearing while this lawsuit is pending.  ECF 73-2, at 10, 37:9–40:18.

"A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court cannot weigh evidence, *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (citing *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659–60 (4th Cir. 2018)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).

**B.     Summary Judgment in the Title VII Context**

Title VII, in relevant part, prohibits employers from "discharg[ing] any individual, or otherwise [] discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

12

national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII is also violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up).

In reviewing a Title VII claim, a federal court "may only consider those allegations included in the EEOC charge," *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 407 (4th Cir. 2013), and those that "can reasonably be expected to follow the charge of discrimination." *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981); *see also Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996).

Constrained by the scope of the EEOC charge and subsequent investigation, a plaintiff may meet her summary judgment burden of establishing a genuine dispute of material fact either by offering direct or circumstantial evidence, or by proceeding under the scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Evans*, 80 F.3d at 959. *McDonnell Douglas* sets out a three-step scheme in which the plaintiff bears the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. *Id.* If the plaintiff meets this burden, the defendant-employer can rebut the presumption of discrimination by presenting evidence of a legitimate, non-discriminatory reason for its employment actions. *Id.* If the defendant-employer provides this reason, the presumption of discrimination "drops out of the picture" and the burden shifts back to the plaintiff to demonstrate that the defendant's rationale is pretextual. *Id.* At bottom, the "plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Id.* (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

In considering the ultimate question of pretext, the Fourth Circuit has repeatedly cautioned district courts to "take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue." *Evans*, 80 F.3d at 958–59 (citing *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir 1987)). Nevertheless, "summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Id.* at 958–59.

### C.    Title VII and § 1981

Much like Title VII, "[§] 1981 provides, in relevant part, that 'all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens,' and guards generally against race-based discrimination in the workplace." *Lemon v. Myers Bigel, P.A.*, 985 F.3d 392, 399 (4th Cir. 2021) (ellipses in original).

Courts analyze Title VII and § 1981 claims under the same basic framework.[6] *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 n.7 (4th Cir. 2002) ("The required elements of a prima facie case of employment discrimination are the same under Title VII and Section 1981." (citation omitted)); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (2015); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 424 n.7 (4th Cir. 2014) ("The standard used to evaluate a racial hostile work environment claim under § 1981 is the same as the standard used under Title VII." (citing *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001)).

---

[6] While the elements necessary to prove a Title VII and § 1981 claim are identical, there are some differences as a court is not limited to the confines of the factual allegations in the EEOC Charge when analyzing § 1981 claim, as § 1981 contains no such limitation. *See Spriggs*, 242 F.3d at 184 n.4 (noting the defendant's hostile work environment claims were not coextensive with his § 1981 claim, which could include more conduct as it was not limited to the events in the EEOC Charge). Accordingly, the Court's analysis under Title VII and § 1981 will be the same, unless factual allegations that may be considered § 1981, and not Title VII, are presented.

14

**D.     MFEPA**

The Maryland Fair Employment Practices Act ("MFEPA") prohibits discriminatory employment practices based on an individual's protected characteristics, including one's race and sex within the State of Maryland. Md. Code Ann., State Gov't ("SG") § 20-606 (2021). The Supreme Court of Maryland has recognized that MFEPA is "modeled on federal anti-discrimination legislation." *Doe v. Catholic Relief Servs.*, 300 A.3d 116, 126 (Md. 2023) (quoting *Molesworth v. Brandon*, 672 A.2d 609, 614 (Md. 1996)). Maryland has a well-established "history of consulting federal precedent in the equal employment area." *Taylor v. Giant of Md., LLC*, 33 A.3d 445, 459 (Md. 2011) (citing *Haas v. Lockheed Martin Corp.*, 914 A.2d 735 (Md. 2007)). For instance, Maryland follows the burden-shifting framework set out in *McDonnell Douglas Corp.*, 411 U.S. at 792, when resolving a claim of retaliation and employment discrimination. *Lockhead Martin Corp. v. Balderrama*, 134 A.3d 398 (Md. App. 2016); *Edgewood Mgmt. Corp. v. Jackson*, 66 A.3d 1152 (Md. App. 2013). As such, the Court's analysis under Title VII and MFEPA, unless otherwise indicated, will be the same.

**III.    ANALYSIS**

As a preliminary matter, Defendant argues that Counts II, VII, X, XIII, and XVII of Plaintiff's Complaint should be dismissed with prejudice because they assert claims under the Montgomery County Human Rights Law and Defendant is not a Montgomery County employer, making the statute inapplicable to Defendant. ECF 67-2, at 19 n. 2. Plaintiff does not address this argument, and therefore abandons these claims.[7] *See generally* ECF 71 (failing to mention Counts

---

[7] *See Gowen v. Winfield*, Civ. No. 20-00247, 2022 WL 822172, at *3 (W.D. Va. Mar. 18, 2022) (noting the "[f]ailure to respond to an argument made in a dispositive pleading results in a concession of that claim" and collecting cases (citation omitted)); *East West, LLC v. Rahman*, 873 F. Supp. 2d 721, 728 (E.D. Va. 2012); *Mentch v. Eastern Sav. Bank, FSB*, 949 F. Supp. 1236, 1246–47 (D. Md. 1997) (stating failure to meaningfully oppose or respond to an argument in a motion constitutes a waiver); *Prince v. Library Co. of Balt. Bar*, Civ. No. 23-00362, 2023 WL

II, VII, X, XIII, and XVIII or respond to Defendant's argument).  Accordingly Counts II, VII, X,

XIII and XVII of Plaintiff's Complaint are dismissed with prejudice.[8]

Next, the Court determines that Plaintiff has failed to establish a genuine dispute of material

fact to support sending Plaintiff's retaliation, discrimination, and hostile work environment claims

to a jury.  For the reasons included herein, all remaining counts (Counts I, III, IV, V, VI, VIII, IX,

XI, XII, XIV, XV, XVI, XVIII) will be dismissed.

### A.    Discrimination Claims

Plaintiff bases his race and national origin discrimination claims (Counts I, III, IV, and V)

on the following alleged adverse actions: (1) his receipt of negative performance evaluations and

corrective actions; (2) the alleged denial of overtime; (3) an alleged "demotion" based on not

having an area of schools assigned to him; (4) the alleged denial of training opportunities; (5) the

alleged denial of contractor assistance; (6) the alleged denial of safety equipment; and (7) the

alleged failure to promote.  ECF 1, at 5–6 ¶ 26.  Defendant argues Plaintiff's allegations fall short

of establishing a prima facie case because Plaintiff has not created a triable issue as to whether the

alleged adverse actions occurred "because of" his race or nationality.  *See* ECF 67-2, at 23–31.

As explained below, the Court agrees with Defendant.

### 1.    Performance Reviews

---

3847430, at *6 (D. Md. June 6, 2023) (finding plaintiff conceded arguments by failing to respond
to defendants' arguments).

[8] Defendant fails to mention Count XIX, which also alleges a violation of Montgomery County
Human Rights Law, ECF 1, at 18, and will be dismissed for the same reason.  *See* Montgomery
County, Md., Code § 27-19, at 27, https://perma.cc/4DL6-HUJX; *see also* ECF 72 (requesting
"this entire action be dismissed with prejudice").  Given this apparent oversight may deprive
Plaintiff of notice that this count is also subject to dismissal, the Court will permit Plaintiff fourteen
(14) days to move to reconsider the dismissal of Count XIX, for the reasons articulated by
Defendant in relation to Counts II, VII, X, XIII and XVII.  *See* ECF 67-2, at 19 n. 2.

Regarding Plaintiff's contention that he was subject to "pretextual write-ups and hostility," ECF 71, at 9 ¶ 3, Defendant argues that (1) a majority of the negative performance reviews did not constitute adverse employment actions as they were not disciplinary in nature; and (2) of the corrective actions that were disciplinary, it is undisputed that comparable corrective actions were issued to individuals outside his protected class (*i.e.*, Caucasians and those of U.S. national origin) for similar violations. ECF 67-2, at 23–25. As such, Defendant argues negative performance reviews cannot serve as evidence of discriminatory treatment or a hostile work environment as a matter of law. *Id.* The Court agrees.

It is well-established that "[p]erformance evaluations constitute adverse employment actions 'only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms and conditions of the recipient's employment.'" ECF 67-2, at 24 ¶ 2 (citing *Jones v. Baltimore City Bd. of Sch. Comm'rs*, Civ. No. ADC-18- 3002, 2021 WL 147033, at \*6 (D. Md. Jan. 14, 2021) (quoting *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 589 (D. Md. 2011))); *see also Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 652 (4th Cir. 2002) (noting district court correctly found a negative evaluation of a plaintiff's work performance did not constitute an adverse employment action as the plaintiff failed to "adduce evidence that the appraisal affected the terms, conditions, or benefits of his employment"). Defendant argues that Plaintiff has presented no evidence showing that the performance reviews had any tangible effect on the terms and conditions of his employment and thus cannot show that they constituted an adverse employment action.[9] *Id.*

_____

[9] Defendant also argues that Mr. Schiemer, who completed Plaintiff's performance evaluations and decided to issue corrective actions, was part of the interview panel that hired Plaintiff for the HVAC Mechanic I position. *See* ECF 67-2, at 23–24 (citing *McCain v. Waste Mgmt., Inc.*, 115 F. Supp. 2d 568, 574 (D. Md. 2000)). "The Fourth Circuit has held that when the same person hires an employee, and then takes an allegedly negative employment action, there is a 'powerful

First, Defendant argues that the majority of negative performance reviews were corrective and not disciplinary in nature. *Id.* at ¶ 3. For instance, Plaintiff received verbal warnings and professional counseling. *See* ECF 73-1, at 183–85 (including corrective action document issued October 15, 2019, indicating verbal counseling when Plaintiff did not assist technicians in his assigned area on October 14, 2019, as directed in the HVA Leads Meeting); ECF 73-1, at 169 (noting verbal warning regarding insubordination based on failure to follow direct supervisors instructions twice on June 4, 2019); ECF 73-1, at 171–73 (indicating failure to fill out timesheet on June 4, 2019, and that in response Plaintiff was provided professional counseling); ECF 73-1, at 186–93 (indicating that on January 1, 2020, Plaintiff received professional counseling, after Plaintiff failed to correctly diagnose a leak in a school facility which caused a 24-hour delay in repair before a different contractor came to fix it). Defendant argues this conduct (as a matter of law) cannot constitute adverse actions. ECF 67-2, at 24. More specifically, Defendant argues that because Plaintiff does not point to any evidence of these actions affecting the terms or conditions of his employment, they do not constitute adverse actions.[10] *See* ECF 71, at 21–22, 28 (arguing

---

inference' that the alleged action was not motivated by discriminatory animus. *McCain v. Waste Mgmt., Inc.*, 115 F. Supp. 2d 568, 574 (D. Md. 2000) (citing *Evans*, 80 F.3d at 959); *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). "Thus, Plaintiff must affirmatively produce evidence to overcome the strong inference that the alleged adverse employment actions were not racially motivated." *McCain*, 115 F. Supp. 2d at 574.

[10] The only case Plaintiff cites, an unpublished case from a different district, does not support the argument that an employer misrepresenting facts in a corrective action memorandum constitutes an adverse action. ECF 71, at 22. Plaintiff cites to *Jones v. Granholm*, Civ. No. 20-0472, 2021 WL 2530677, at *10 (D.D.C. June 21, 2021). In *Jones v. Granholm*, the court merely notes "a counseling memorandum may be materially adverse where it contains 'abusive language,'" or "where it leads 'to consequences like ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities.'" 2021 WL 2530677, at *10 (first quoting *Locks v. Lew*, 200 F. Supp. 3d 254, 263 (D.D.C. 2016) then quoting *Gilliard v. Gruenberg*, 302 F. Supp. 3d 257, 283 (D.D.C. 2018)); *see also Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008) (holding employer-issued "letter of counseling" that contained "job-related constructive criticism" did not constitute a materially adverse action sufficient to support a

only generally that negative performance reviews can lead to progressive discipline); *see also Thompson*, 312 F.3d at 652.

Defendant notes that the only corrective actions that went beyond verbal counseling were two written reprimands on January 23, 2020, and January 27, 2020. ECF 67-2, at 24; *see also* ECF 73-1, at 194–200 (noting Plaintiff failed to respond to an emergency call and noting Plaintiff "does not listen to verbal and constructive criticism. Communicating to [Plaintiff] is extremely hard"); ECF 73-1, at 201–206 (noting Plaintiff failed to properly respond to another emergency call). As to these, Defendant argues Plaintiff has not shown that he was treated differently from similarly situated employees outside his protected class. ECF 67-2, at 24. The record reveals that both Caucasian and African American employees, as well as employees of U.S. and foreign national origin received corrective actions for infractions, just like Plaintiff. *See* ECF 74-1 (Simmons Declaration), at 2 ¶ 5 (noting the documents Ms. Simmons compiled "show that other employees, including white employees and employees of U.S. national origin, receive corrective actions and discipline where warranted for infractions similar to those of [Plaintiff]"); ECF 74-3 (Schiemer Declaration), at 3 ¶ 8; ECF 74-3, at 9–79 (referring to five corrective actions issued against other HVAC Mechanics in the 900 Shop between 2018 and 2021, including two against Caucasian Americans (Jason Pottier and Michael Spector) and three against African Americans (Mitch Baylor, Timothy Gould, and Victor Jones)); ECF 73-1, at 50, 197:12–198:14; ECF 73-1, at 261 (regarding a verbal warning to a Caucasian American co-worker, Jason Pottier); ECF 74-4 (Fossett Declaration), at 4 ¶ 10 (testifying that "both African American and Caucasian and both of U.S.

---

retaliation claim); *Hyson v. Architect of Capitol*, 802 F. Supp. 2d 84, 102 (D.D.C. 2011) ("A letter of counseling . . . if not abusive in tone or language or a predicate for a more tangible form of adverse action, will rarely constitute materially adverse action under Title VII."). This does not support Plaintiff's assertion that the mere possibility of progressive discipline can transform an otherwise non-adverse action into an adverse action that is redressable under the law.

national origin and non-U.S. national origin" were required to pay their pending traffic citations);

ECF 74-4, at 15–39 (providing documentation of other individuals whose names were included in

the audit and who had to pay citations including Bryan Ruth, Orlando Whittington, and James

Boone).[11]   Thus, Defendant argues Plaintiff's claims of disparate discipline or a hostile work

environment due to his race or national origin based on the performance evaluations and corrective

actions is unsupported by the record.  ECF 67-2, at 25.

In Plaintiff's Response, ECF 71, Plaintiff states that he "has shown that Defendant took

adverse actions against him which others outside of his protected class did not suffer." ECF 71,

at 29.  However, Plaintiff does not cite to record evidence supporting this conclusory allegation.

*See id.*  Regarding corrective actions, all Plaintiff argues is that "Defendant issued Plaintiff critical

statements about his performance which were unfounded."  ECF 71, at 29.  Plaintiff has not

provided any caselaw to support that such an occurrence constitutes an adverse action when there

are no negative employment repercussions.[12]  *See id.*; *supra* note 10.  Accordingly, the Court is

persuaded that none of the corrective actions constituted "adverse actions" for purposes of stating

a claim under Title VII for discrimination based on either race or national origin.

---

[11] Defendant does not expressly indicate the race or nationality of these individuals, though Mr. Fossett's declaration can only be interpreted to suggest the races and nationalities of these three cited individuals includes both members of Plaintiff's protected class, and members outside of it. *See* ECF 74-4, at 4 ¶ 10.

[12] While Plaintiff was eventually placed on administrative leave, Plaintiff has failed to demonstrate a nexus between the administrative leave decision and Plaintiff's allegedly false corrective actions. *See* ECF 71, at 29.  Rather, Defendant produced evidence that the administrative leave decision was made based upon the confrontation Plaintiff had with his supervisor, in which Plaintiff made statements Mr. Schiemer perceived as threatening.  ECF 73-3, at 25, 97:11; ECF 73-1, at 54, 214:5–10; ECF 73-2 (Carpenter Deposition), at 8-9, 31:22–33:6; ECF 73-2 (Notification of Administrative Leave), at 50; ECF 73-1, at 264–65; ECF 73-2, at 52–53.

Alternatively, Defendant also argues that the undisputed facts fail to the demonstrate Defendant issued corrective actions "because of" Plaintiff's protected status. ECF 67-2, at 24. Plaintiff does not contest that some employees outside Plaintiff's protected class also received corrective actions. *See* ECF 71 (failing to raise the argument). Defendant argues the race-neutral nature of corrective actions is undisputed, and that this admission is fatal to Plaintiff's discrimination claims. ECF 72, at 2 (citing Fed. R. Civ. P 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . ." (emphasis added))); *see also Hawkins v. Leggett*, 955 F. Supp. 2d 474, 486 (D. Md. 2013) ("[I]f a party 'fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion.'" (quoting Fed. R. Civ. P. 56(e)(2))).

Because it is undisputed that between 2018 and 2021, corrective actions were issued against five other HVAC Mechanics in the 900 Shop to employees both inside and outside Plaintiff's protected class, Defendant argues there is not enough factual support for a prima facie case of racial discrimination. *See* ECF 72, at 2; ECF 74-3, at 9–79 (including two corrective actions against Caucasian Americans (Jason Pottier and Michael Spector) and three against African Americans (Mitch Baylor, Timothy Gould, and Victor Jones)); ECF 73-1, at 50, 197:12–198:14; ECF 73-1, at 261 (regarding a verbal warning to a Caucasian American co-worker, Jason Pottier). The Court agrees.

Accordingly, Plaintiff has failed to adduce evidence creating a genuine dispute of material fact as to whether corrective actions he received were adverse actions imposed upon Plaintiff "because of" his race or nationality, and Defendant has adduced affirmative and undisputed evidence indicating corrective actions were issued on a race-neutral basis.

2.    Overtime

Next, Defendant argues Plaintiff's claim that Plaintiff was denied overtime on the basis of

his race or national origin must fail because Plaintiff had the second highest number of overtime

hours among individuals in the 900 Shop. ECF 74-1 (Simmons Declaration), at 2 ¶ 4 (indicating

Ms. Simmons compiled a "chart . . . from PGCPS records concerning overtime hours" which

"demonstrates that [Plaintiff] received the second highest number of overtime hours amongst

individuals in the 900 [S]hop where he worked"). Further, Plaintiff's claim is undercut by the fact

that the employee with the highest number of overtime hours, Eric Archer, was African American.

*Id.*

Plaintiff states in a footnote that "Defendant's testimony that Plaintiff received the second

highest number of overtime hours is not credible and thus, this is a fact in dispute." ECF 71, at 24

n.4. Additionally, Plaintiff alleges, without citation to the record, that Defendant denied Plaintiff

overtime work when he requested it, but allowed white workers to receive overtime work

whenever they requested it. ECF 71, at 24. *But see* ECF 73-1, at 25, 97:9–98:9 (acknowledging

that Plaintiff did not know how many hours of overtime other employees were approved for).

However, as Defendant notes, such a conclusory allegation without citation to the record does not

suffice to establish a genuine dispute of material fact. ECF 72, at 4-6; *see also May v. Roadway

Express, Inc.*, 221 F. Supp. 2d 623, 629 (D. Md. 2002) (holding employee's subjective belief that

he was denied overtime based on his disability was insufficient to establish prima facie case of

discrimination, absent any objective evidence); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

("[A] complete failure of proof concerning an essential element of the non-moving party's case

necessarily renders all other facts immaterial [and] [t]he moving party is 'entitled to judgment as

a matter of law.'" (citation omitted)). Plaintiff has failed to meet his burden of adducing record

evidence sufficient to generate a genuine dispute of material fact as to whether Defendant denied

22

Plaintiff overtime opportunities on the basis of his race or national origin. *See also May*, 221 F. Supp. 2d at 627 ("Unsupported speculation is insufficient to defeat a motion for summary judgment." (citing *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987))). Therefore, Plaintiff's unsupported speculation that Defendant's assertion is not credible, alone, will not defeat Defendant's motion for summary judgment.

### 3.   Demotion/Transfer

Next, Plaintiff alleges that he was "demoted" when Mr. Schiemer "took away" the schools that had been assigned to him. ECF 1, at 5 ¶ 26; *id.* at 8 ¶ 39; ECF 73-1, at 24, 93:1–11; ECF 73-13 (Downer Declaration), at 2 ¶ 9. Defendant argues that Plaintiff "was, and remains an HVAC I technician and never lost any pay or benefits when he no longer had specific schools assigned to him." ECF 67-2, at 28 (citing *Jones*, 2021 WL 147033, at *5). Although Plaintiff acknowledges in his declaration that he now understands that certain schools were "taken away" from him pursuant to an agreement between Defendant and Plaintiff's Union regarding work assignments for Grade 16 Mechanics, ECF 73-13 at 3 ¶ 9, it is unclear whether Plaintiff still challenges that such an agreement existed, as Plaintiff merely notes by declaration that Defendant "never communicated to Plaintiff that Defendant had reached any such agreement with the Union." *See* ECF 71, at 10; ECF 73-13, at 2–3 ¶ 9.

The relevance of this point is unclear.  Nevertheless, Plaintiff correctly notes that "[a] transfer involving loss of prestige or an objectively demeaning change of working conditions can amount to adverse employment conditions." *Caussade v. Brown*, 924 F. Supp. 693, 700 (D. Md. 1996).  However, Plaintiff cites to no record evidence supporting he experienced "a loss of prestige" or that he "lost responsibility due to the change." *See* ECF 71, at 23; *see also Caussade*, 924 F. Supp. at 701 (finding a plaintiff's allegations that she was relieved of her principal managerial responsibilities was insufficient to establish an adverse employment action when

plaintiff failed to "point to one specific lost responsibility" and deposition testimony suggested the plaintiff was performing similar duties in the transferred-to position), *aff'd*, 107 F.3d 865 (4th Cir. 1997). Just as in *Caussade*, Plaintiff's conclusory allegation that he has lost responsibilities, without specification, is insufficient when Defendant has adduced information that Plaintiff engaged in similar duties both before and after Plaintiff alleged his schools were purportedly "taken away." *Compare* ECF 73-1, at 38, 150:1–22 (indicating working on roof units was part of his job responsibilities prior to having a school "taken away" from him) *with* ECF 73-1, at 24, 93:18–94:8 (complaining that Plaintiff's schools were taken away because Mr. Dietzer informed him this meant he would no longer work on AC units, and instead was going to "do[] exhaust fans on the roof").

Second, to the extent Plaintiff asserts that the transfer of his work schedule from "A" to "B" shift constituted discriminatory treatment, Plaintiff testified he performed the same duties in A shift and B shift. *See* ECF 71, at 22–23 (asserting both his "demotion" and "transfer" as adverse actions); ECF 73-1, at 47 185:8–16 (acknowledging A and B shift performed the same duties). In *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), the Supreme Court recently clarified that employees asserting a transfer constituted an adverse employment action under Title VII must only "show some harm respecting an identifiable term or condition of employment." *Id.* at 974. Such plaintiffs do not have to show that the harm they incurred was "significant, serious, or something similar." *Id.* at 973. Yet even recognizing that the harm need not be significant, the harm must, nevertheless, be alleged. *See Bouchat*, 346 F.3d at 526 (noting the Court must "prevent factually unsupported claims and defenses from proceeding to trial." (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003))). Plaintiff has not done so. *See* ECF 71. Plaintiff does not assert this transfer caused any loss of prestige or responsibility, and Defendant produced evidence that

there was only an hour-difference in start times to stagger the number of employees and limit exposure to Covid-19. *See* ECF 73-3, at 23, 89:6–17 (indicating the A and B shift are "both a.m. shifts" with one being a "6:00 a.m." shift and one being a "7:00 a.m." shift). Plaintiff's claims regarding a demotion or transfer are factually unsupported as they fail to produce a genuine dispute of material fact.

### 4. Training Opportunities

Next, Plaintiff asserts he was denied training opportunities, such as training on the energy control monitor systems ("EMS") and other unspecified training that would allow him to teach other employees how to safely perform "potentially life-threatening work" in accordance with the Occupational Safety and Health Administration. ECF 71, at 23–24 (citing ECF 73-1, at 25, 98:10–100:11).

First, Plaintiff asserts EMS training was provided to "white employees, such as Vaughn Diggs, José Solorzano, Garth Deitzer, Donnie Canada, and Jason Walker." ECF 71, at 9 (citing ECF 73-1, at 25, 98:10-100:11). This assertion, however, is belied by Plaintiff's own deposition testimony in which Plaintiff identified Mr. Diggs as African American, ECF 73-1, at 16, 62:17–19, and Mr. Solorzano as Hispanic, *id.* at 31, 122:16–20. Further, Plaintiff testified that each of the individuals that received EMS training were Grade 18 HVAC mechanics, unlike Plaintiff who is a Grade 16 HVAC mechanic. ECF 73-1, at 25, 98:22–99:19.

Plaintiff argues Defendant "never told Plaintiff that he was not qualified to receive training based on his grade (16) or that only senior-level mechanics could receive training." ECF 71, at 9 (citing ECF 73-13, at 2 ¶ 4). The relevance of this point is, again, unclear. Ultimately, Plaintiff has not adduced any record evidence to suggest he was denied EMS training on account of his race, particularly when Plaintiff himself identifies another black employee who did receive such training. *See* ECF 71, at 9.

In fact, the record reflects that on at least one occasion, Plaintiff refused free training, and became defensive and confrontational when a supervisor asked about his lack of attendance. ECF 74-1, at 38. In a letter from Mr. Canada to Mr. Schiemer describing an incident that occurred on May 10, 2019, Mr. Canada explained that he noticed Plaintiff left an in-house pump-coupling class, and later asked Plaintiff about his lack of attendance. *Id.* In response, Mr. Canada described Plaintiff as confrontational and defensive, "accusing the shop of favoritism and nepotism." *Id.* (observing that "[t]his type of extremely defensive behavior seems to be a constant issue for him. Every technician he has worked with has said that h[e] is extremely confrontational and that they do not want to work with him anymore").

Nevertheless, Plaintiff alleges that "Defendant also denied Plaintiff another opportunity to participate in a training program, on or about January 7, 2019, that would allow him to teach other employees, though Defendant provided this same opportunity to a white employee." ECF 71, at 9 (citing ECF 73-13, at 2 ¶ 4). The record citation Plaintiff refers to is his own deposition, in which he repeats the above-quoted allegation verbatim. *See* ECF 73-13, at 2 ¶ 4. Plaintiff never identifies this "white employee" who received training that would allow him to teach other employees or what specifically this training was that allowed employees "to teach other employees." *See generally* ECF 71; ECF 73-13. The only mention of a white employee teaching other employees is Sam Stefanelli, who was asked to teach a carpentry class, ECF 73-1, at 42, 167:1–9; however, *Plaintiff* was never denied the opportunity to learn carpentry, *see id.* at 166–167 (referring only to another employee named Dale Legall who did not receive a Grade 8 position that a Caucasian co-worker received, despite Mr. Legall being "a master of a carpenter"). In fact, Plaintiff asserted carpentry is beyond the scope of his job. ECF 73-1, at 16, 64:17–19 (referring to being instructed to complete carpentry tasks as "out of [his] jurisdiction"). Plaintiff's claims that he was denied

26

training opportunities based on his race or national origin are unsubstantiated by evidence in the record, and Plaintiff's mere speculation on this point cannot create a triable issue of fact.

### 5. Contractor Assistance

Next, Plaintiff alleges a group of white employees received favored treatment, including job assistance from contractors. ECF 71, at 9 ("Defendant treated Plaintiff differently than his white co-workers by denying him assistance when he asked for it, even though Defendant provided assistance for white employees."); *see also id.* (citing ECF 73-13, at 2 ¶ 5, in which Plaintiff testified that he observed a certain group that received favorable treatment, and that those in this "clique were largely white"); ECF 73-1, at 26, 101:4-102:18 (identifying Vaughn Diggs (African American); Garth Deitzer (Caucasian American); Donald Canada (Caucasian American); Lance Schiemer (Caucasian American); Mario Giron (Hispanic, nationality unknown); José Solorzano (Hispanic American); Justin Bond (Caucasian American); Darrian Crooks (Black, Jamaican), Victor Jones (African American), Larry Paterson (African American)).

Defendant argues that as a matter of law, the alleged denial of assistance in performing job duties is not an adverse action. ECF 67-2, at 30 (citing *Spangler v. City of Phila.*, Civ. No. 10-3434, 2012 WL 1835599, at *13 (E.D. Pa. May 21, 2012), in which the court held that a plaintiff's claim that co-workers in another squad would not talk to her and would not help her was a "petty slight or minor annoyance" and not actionable as retaliation or harassment); *see also Gaines v. Baltimore Police Dep't*, 657 F. Supp. 3d 708, 744 (D. Md. 2023) ("The anti-retaliation provision of Title VII does not protect against petty slights, minor annoyances, and simple lack of good manners." (alteration removed) (internal citation and quotation marks omitted) (quoting *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009)); *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019). And, alternatively, Defendant argues it has produced a legitimate, non-discriminatory rationale regarding contractor assignments, specifically, that contractors are

27

assigned to work on specific projects, not to assist certain employees. *See* ECF 67-2, at 30 (citing ECF 74-3, at 2 ¶ 7).

Plaintiff does not expressly dispute Mr. Schiemer's assertion concerning the assignment of contractors. *See* ECF 71, at 9. Nor can Plaintiff dispute that Black individuals and individuals of foreign national origin were members of the "clique." ECF 73-1, at 26, 101:4-102:18. Plaintiff merely argues he was not notified of the policy or practice of assigning contractors by work project. ECF 71, at 9 (citing ECF 73-1, at 26, 102:4-11 and ECF 73-13, at 2 ¶ 6).

The denial of contractor assistance is not recognized as an adverse action actionable under Title VII. *See Ogden v. Potter*, 397 F. App'x 938, 939 (5th Cir. 2010) (indicating that denial for auxiliary assistance likely does not constitute an adverse employment action for purposes of Title VII retaliation claim); *Garafola v. Dejoy*, Civ. No. 17-01827, 2022 WL 4642091, at *9 (E.D.N.Y. Sept. 30, 2022) ("Even assuming arguendo that the denial of a request for auxiliary assistance required Plaintiff to work some additional amount of time at the end of her shift, such denials were still not adverse employment actions."); *see also DeCesare v. National R.R. Passenger Corp.*, Civ. No. 98-3851, 1999 WL 330258 *4 (E.D. Pa. May 24, 1999) (holding assignment of more difficult work did not constitute a tangible employment action); *Davis v. NYS Dep't of Corr. Attica Corr. Facility P.O. Box 149 Attica, N.Y. 14011*, 46 F. Supp. 3d 226, 234 (W.D.N.Y. 2014) (holding plaintiff's allegation that he was deliberately assigned a disproportionate number of African American and Hispanic inmates who were disruptive, was insufficient to establish an adverse action because "simply being assigned undesirable work duties . . . [is] insufficient to establish adverse employment action").

Regardless, Plaintiff has not demonstrated that the assignment of contractors per work assignment was pretextual, as Plaintiff has adduced no information about the contractors assigned.

*See* ECF 71, at 9 (citing only to Plaintiff's declaration, ECF 73-13, at 2 ¶ 6, and Plaintiff's deposition testimony, ECF 73-1, at 26, 102:4–11, in which Plaintiff asserts the same general allegations about contractors being assigned to members of the "clique"). Plaintiff has not contested Mr. Schiemer's explanation of contractor assignments. ECF 71, at 9 (merely faulting Defendant for "never communicat[ing] to Plaintiff any policies or procedures regarding the assignment of contractors"). This is insufficient to generate a triable issue of fact.

### 6.   Safety Equipment

Next, Plaintiff alleges he was denied proper safety equipment and that on January 21, 2020, he was sent to perform "potentially life-threatening work" without safety equipment. ECF 1 at 8 ¶ 39. Plaintiff does not identify what safety equipment he was denied, or what the life-threatening work entailed. *See generally* ECF 1; ECF 71. Nor does Plaintiff allege that other white mechanics received the safety equipment. ECF 73-13, at 3 ¶ 10 (stating only "I am not aware of any white mechanics of my grade, Grade 16, who were denied safety equipment"). Plaintiff's claim that he is not aware of a white mechanic who was *denied* safety equipment does not in fact allege that white mechanics *received* it.

Defendant argues that, as a matter of law, Plaintiff's statement does not defeat Defendant's evidence that safety equipment is available to employees upon request to the Shop Leads or Master Foreman, ECF 74-3, at ¶ 6, and in any event, that the denial of safety equipment does not constitute an adverse action in a disparate treatment claim. *See* ECF 67-2, at 30. The Court agrees that there is scant support for the argument that a denial of safety equipment, as alleged here, is an adverse action. *See id.* (citing *Fanord v. Washington Metro. Area Transit Auth.*, Civ. No. TDC-14-3973, 2017 WL 3887855, at *5 (D. Md. Sept. 5, 2017), a case in which the court held that "[a]lthough [Plaintiff] claims that the failure to provide him with . . . safety equipment constituted religious or national origin discrimination, such allegedly disparate treatment does not constitute an adverse

employment action that could support a Title VII claim"); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (defining an adverse employment action under Title VII as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"); *see also Ross v. Pentair Flow Techs., Inc.*, No. 19-2690, 2020 WL 1028304, at *10 (D. Kan. Mar. 3, 2020) (finding that where "[t]he court is given no factual context for knowing what kind of safety equipment was withheld and under what circumstances" plaintiff had failed to establish an adverse action as the court was "in the dark as to what the plaintiff is alleging").

Plaintiff has simply not alleged sufficient facts to support the claim that the denial of unspecified safety equipment causing an unexplained life-threatening situation constituted a materially adverse action. *See, e.g., Brooks v. City of Utica*, 275 F. Supp. 3d 370, 379 (N.D.N.Y. 2017) (finding a plaintiff's generalized allegations of safety concerns did not constitute an adverse employment action where the plaintiff failed to specifically allege that he was forced to fight a fire with malfunctioning safety equipment). And even if he had, Plaintiff's general observation about his lack of knowledge of white co-worker's being denied safety equipment, ECF 73-13, at 3 ¶ 10, is insufficient to create a triable issue of fact as to whether Plaintiff's denial of safety equipment—assuming his allegation is true—occurred "because of" Plaintiff's race or national origin. *Anderson*, 477 U.S. at 251–52.

### 7.   Promotions

Finally, Plaintiff alleges that on September 30, 2019, he was denied a promotion on the basis of his race and national origin and that the position went to a white co-worker. *See* ECF 1, at 5 ¶ 26; *id.* at 8 ¶ 39. Defendant argues that Plaintiff's allegation is barred because Plaintiff failed to exhaust his administrative remedies by including this claim within Plaintiff's EEOC charge. *See* ECF 67-2, at 19 (citing *Balas*, 711 F.3d at 406–08, which explains that when "Title VII claims

30

exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred"). Plaintiff concedes that his "failure to promote" claim was not included within Plaintiff's EEOC charge, *see* ECF 71, at 17, and instead argues his failure to promote claims are exhausted because they are "reasonably related" to his EEOC charge and because they "can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in [his] subsequent civil suit." *Id.* (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247, 247–48 (4th Cir. 2000)).

It is well recognized that "allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charges, as surely would an initial failure to file a timely EEOC charge." *Stukes v. Aetna Insulated Wire Co.*, 976 F. Supp. 386, 390 (E.D. Va. 1997) (quoting *Doyle v. Sentry Ins.*, 877 F. Supp. 1002, 1007 (E.D.Va.1995)), *aff'd*, 145 F.3d 1326 (4th Cir. 1998). Thus, though "courts construe [EEOC charges] liberally," *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005), courts are not "at liberty to read into administrative charges allegations they do not contain," *Balas*, 711 F.3d at 408. "A claim will also typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits." *Chacko*, 429 F.3d at 509; *see also Thiessen v. Stewart-Haas Racing, LLC*, 311 F. Supp. 3d 739, 743–44 (M.D.N.C. 2018) (quoting *Chacko*, 429 F.3d at 509). "[T]he EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." *Chacko*, 429 F.3d at 510 (quoting *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001)).

31

Here, Plaintiff alleges in his EEOC charge that he was discriminated against "with respect to discipline and harassment" based on race and national origin and that he was retaliated against after filing an internal complaint. *See* ECF 67-2, at 18 (citing ECF 73-1 (Downer Deposition), at 40–41, 159:17–161:12 and ECF 73-1 (EEOC Charge), at 232–34). Plaintiff argues, without citation to the record, that failure to promote claims were not a surprise to Defendant, as "Plaintiff raised those complaints internally to Defendant throughout his employment." ECF 71, at 17.

Further, Plaintiff argues he has "specifically alleged that Defendant's failure to promote him was a result of its overall discriminatory and retaliatory animus toward him." *Id.* However, Plaintiff has, again, failed to point to facts in the record that would support the "minimum" requirements outlined in *Chacko*: that the EEOC charge and newly raised claim in federal court "describe the same conduct and implicate the same individuals." *Chacko*, 429 F.3d at 510; *see* ECF 1, at 5 ¶ 26(f) (alleging he was denied "a position as [an] Area Coordinator" on September 30, 2019). Plaintiff does not point to facts suggesting the same actors were involved in the failure to promote and discriminatory discipline claims. *See* ECF 71, at 17. The only evidence adduced comes from Plaintiff's deposition in which he says he applied for the position of Area Coordinator twice, and that he told Dana Dandridge, a plumber, his plans and saw Mr. Dandridge speaking with Mr. Schiemer and "heard [his] name come up," as if Mr. Dandridge was complaining to Mr. Schiemer that it would not be fair if Plaintiff was promoted. ECF 73-1, at 29–30, 115:9–199:9; *see also* ECF 73-1, at 176 (notice of receipt of Plaintiff's application on June 8, 2019, from the Division of Human Resources). Plaintiff never received a reason for not being selected and he does not know who was selected. *Id.* There is nothing connecting Mr. Schiemer to the Division of Human Resources' decision not to promote Plaintiff to the Area Coordinator position. *See generally* ECF 71, at 17 (stating, without citation to the record, that the failure to promote "claims

were not a surprise to Defendant, as Plaintiff raised those complaints internally to Defendant throughout his employment").

Ultimately, it is the responsibility of the party raising an argument to formulate the argument, and the Court bears no responsibility to flesh out an unexplained argument on a party's behalf. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (noting it is "not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones"); *Clayton v. Nationwide Mut. Ins. Co.*, 260 F. Supp. 3d 514, 521 (D.S.C. 2017) ("The court has no obligation to fashion arguments for a party or to further develop a party's argument when it is wholly conclusory, unexplained, and unadorned with citation to legal authority."); *Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1289 n.7 (S.D. Fla. 2021) ("The onus is upon the parties to formulate arguments." (citation omitted)).

Given that Defendant points to record evidence that the Division of Human Resources elected not to promote Plaintiff, ECF 73-1, at 176, and given that Plaintiff does not provide evidence that the "same actors were involved" or the same "conduct was implicated," *see* ECF 71, at 17 (failing to point to record evidence and stating that the failure to promote was "a result of discriminatory and retaliatory animus against him" in a conclusory fashion), the Court finds Plaintiff failed to exhaust his "failure to promote" claim as Plaintiff has failed to demonstrate such claims are reasonably related to claims within the EEOC charge.[13]   Thus, in analyzing Plaintiff's

---

[13] To be clear, this conclusion applies only to the Court's analysis of Plaintiff's Title VII claims, which are limited by the scope of the EEOC Charge—this conclusion is not applicable to the § 1981 claim. *See Spriggs*, 242 F.3d at 191 n.4 (noting the defendant's hostile work environment claims were not coextensive with his § 1981 claim, which could include more conduct as it was not limited to the events in the EEOC Charge). However, the Court will not analyze the failure to promote claim *inter alia* for an independent reason: Plaintiff has not contested Defendant's claim that Plaintiff failed to establish he was more qualified than the candidates selected for the positions he applied for, and these points are conceded. *See* ECF 72, at 4–5 (noting this concession).

claims of disparate treatment and retaliation, the Court will not consider the alleged adverse action

of being denied promotional opportunities.  In sum, Plaintiff's counts alleging disparate and

unequal terms and conditions on the basis of Plaintiff's race and national origin fail to establish a

prima facie case of discrimination.  His claims that he received negative performance reviews

either involve non-adverse actions or disciplinary actions that Plaintiff has not established were

taken on account of Plaintiff's race or national origin.  *See supra* Section III.A.1.  Plaintiff's claim

that he was denied overtime is belied by record evidence that he received the second highest

amount of overtime hours and his acknowledgement that he has no personal knowledge as to the

number of his co-worker's approved overtime hours.  *Supra* Section III.A.2.  Plaintiff fails to

establish a genuine dispute of fact as to whether he was demoted or transferred when Plaintiff

establishes no specific facts indicating differences in job responsibilities, status or prestige, or

dissimilar schedules.  *See supra* Section III.A.3.  Plaintiff's unsubstantiated and general claims

about being denied training opportunities do not create a genuine dispute as to whether race or

national origin motivated his denial of EMS training (which both Black and non-U.S. national

workers received), or his denial of carpentry lessons (which were beyond Plaintiff's job

description).  *See supra* Section III.A.4.  Plaintiff's claim of a lack of contractor assistance also

fails for lack of support linking contractor assignments to race, given the employees who obtained

such support included both Black and non-U.S. national workers.  *See supra* Section III.A.5.

Finally, Plaintiff's general claims about being denied unspecified safety equipment and suspicion

that Caucasian co-workers were not denied safety equipment is facially insufficient to raise a

genuine dispute, *supra* Section III.A.6., and Plaintiff's failure to promote claims are otherwise time barred. *Supra* Section III.A.7. Counts I, III, IV, and V are, therefore, dismissed.[14]

### B.    Hostile Work Environment Claims

In Counts XV, XVI, and XVIII, Plaintiff alleges that he experienced a hostile work environment due to his race (Counts XV and XVI) and national origin (Counts XVIII). *See* ECF 1, at 15–18. Plaintiff alleges this hostile work environment violated Title VII and § 1981. *See id.* For the reasons herein, the Court finds Plaintiff has failed to demonstrate a genuine dispute of material fact sufficient to bring these claims to trial.

To prevail under both Title VII and § 1981, a plaintiff must "demonstrate . . . a racially hostile work environment, a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011) (alteration and internal quotation marks omitted)); *Freeman*, 750 F.3d at 420; *Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 773–74 (D. Md. 2010). "While the first element is subjective, the rest of the test is made up of objective components based on a 'reasonable person' standard." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781–82 (4th Cir. 2023) (quoting *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009)).

Plaintiff describes the unwelcome conduct as: (1) being yelled at and being spoken to in a condescending and disrespectful manner; (2) micro-managing Plaintiff's work; (3) racial, national

---

[14] Because Title VII is analyzed with the same elements of a § 1981 claim, *see supra* Section II.C, and an MFEPA claim, *see supra* Section II.D, the Court's conclusion as to Plaintiff's counts alleging violations of Title VII (Counts I, IV) apply to Plaintiff's § 1981 claim (Count III), and Plaintiff's MFEPA claim (Count V).

origin related and retaliatory harassment and comments; (4) workplace bullying; (5) excessive supervision above and beyond what other employees experienced; (6) fabricated performance issues; (7) actions to limit or reduce Plaintiff's overtime work; (8) denial of training opportunities to Plaintiff by Defendant; (9) refusal to provide Plaintiff with a co-worker or contractor to assist him in his work for Defendant; and (10) having his work truck taken from him and his belongings placed in a box. ECF 1, at 17–18.

Defendant argues Plaintiff's allegations fail as a matter of law to establish a hostile work environment. *See* ECF 67-2, at 22 (citing *Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013)). In *Buchhagen v. ICF International, Inc.*, a plaintiff alleged that her supervisor created a hostile work environment over a period of nine months by "'mockingly' yelling at the plaintiff" in a meeting, "yelling and pounding her hands on her desk during another meeting," "repeatedly harp[ing]" on a mistake made by plaintiff, making "snide comments" to plaintiff, "playing favorites with employees and pitting employees against each other," and "unfairly scrutinizing and criticizing [plaintiff's] use of leave and compliance with [her supervisor's] directives." 545 F. App'x 217, 219 (4th Cir. 2013). In an unpublished opinion, the Fourth Circuit affirmed the district court's dismissal of this claim given "the conduct alleged falls far short of being severe or pervasive enough to establish an abusive environment." *Id.* While *Buchhagen* involved a hostile work environment claim based on age discrimination, *see id.* at 218–19, Defendant's comparison is nevertheless well taken as the cases both include claims of general favoritism and unpleasantness that "falls far short of being severe or pervasive enough to establish an abusive environment." *Id.* at 219.

However, the Court need not reach the third "severe or pervasive" element as the conduct Plaintiff alleges "does not make it past step two: a reasonable person could not find—based on the

record—that it occurred *because* Plaintiff[] [is] Black," or as is also relevant in this case, Guyanese. *Robinson*, 70 F.4th at 782. Defendant argues Plaintiff has failed to demonstrate these actions were taken "because of" Plaintiff's race or national origin. *See* ECF 67-2, at 21. Specifically, Defendant argues that Plaintiff's allegation of a "clique" of favored employees is insufficient to generate a genuine dispute of material fact because "both Caucasian and African American employees, as well as employees of U.S. national origin and foreign national origin" were in the "clique." *See supra* Section III.A.4 (discussing Plaintiff's allegations of a "clique" of employees that included, among others, Vaughn Diggs (African American); Mario Giron (Hispanic); José Solorzano (Hispanic American); Victor Jones (African American), Larry Paterson (African American), and Darrian Crooks (Black, Jamaican)); *see also* ECF 73-1, at 26, 101:4-102:18.

Plaintiff counters he that he has shown "Defendant took adverse actions against him which others outside of his protected class did not suffer." ECF 71, at 29. In particular, Plaintiff alleges that Defendant issued Plaintiff critical statements about his performance (which Plaintiff alleges were unfounded), failed to provide safety equipment to Plaintiff, and failed to take seriously Plaintiff's complaint of a threat of workplace violence against a white co-worker, resulting in a "sham investigation and a finding in favor of the white coworker." *Id.*

These actions, however, are essentially Plaintiff's retaliation claim repackaged as a hostile work environment claim. While a retaliatory hostile work environment claim is cognizable under Title VII, Plaintiff's complaint alleges only a hostile work environment on the basis of his race and national origin—not retaliation. *See* ECF 1 (Count XV), at 15 (alleging a discriminatory hostile work environment based on race in violation of Title VII); *id.* (Count XVI), at 16 (alleging a discriminatory hostile work environment based on race in violation of § 1981); *id.* (Count XVIII), at 17 (alleging discriminatory hostile work environment based on national origin in violation of

Title VII). *See also Dudley v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 164 (D.D.C. 2013) (noting courts "frown on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim." (quoting *Baloch v. Norton,* 517 F.Supp.2d 345, 364 (D.D.C. 2007))); *see also Franklin v. Potter,* 600 F. Supp. 2d 38, 76 (D.D.C. 2009) ("Because plaintiff's allegedly hostile events are the very employment actions he claims are retaliatory, he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim."); *Brannon v. Secretary, Dep't of Veterans Affs.*, No. 22-10838, 2023 WL 1161129, at *2–5 (11th Cir. Jan. 31, 2023) (affirming district court's dismissal of retaliatory hostile work environment claim on a motion to dismiss where plaintiff asserted only a "substantive" or discriminatory hostile work environment claim, not a retaliatory hostile work environment).

Plaintiff fails to cite to record evidence supporting the argument that any of the actions that were allegedly unique to Plaintiff, such as "issuing critical" performance evaluations, "failing to provide safety equipment" and failing to "take seriously" Plaintiff's threat from Mr. Howell, were taken because of Plaintiff's race or national origin. *See* ECF 71, at 29. Alternatively, even were the Court to consider Plaintiff's retaliatory hostile work environment claim, Plaintiff has failed to establish a prima facie case of retaliation, as discussed next. *See infra* Section III.C.

As such, Plaintiff's hostile work environment claims, Counts XV, XVI, and XVIII, are dismissed.

### C.    Retaliation Claims

In Counts VI, VIII, IX, XI, XII, and XIV, Plaintiff alleges he was retaliated against for complaining about discriminatory treatment. *See* ECF 1, at 10–14. Defendant moves for summary judgment on all of Plaintiff's retaliation claims. ECF 67.

Section 2000e-3(a) of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against
> any of his employees . . . because he has opposed any practice made an unlawful
> employment practice by this subchapter, or because he has made a charge, testified,
> assisted, or participated in any manner in an investigation, proceeding, or hearing
> under this subchapter.

42 U.S.C. § 2000e-3(a).

The purpose of this provision is "to protect employees who complain about real or perceived discrimination in the workplace from retaliation, which threatens to chill the willingness of employees to speak up." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022) (citing *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1189 (10th Cir. 2002)).

To establish retaliation in violation of Title VII or § 1981, a plaintiff must establish that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) that a causal connection existed between the protected activity and the asserted adverse action. *Laurent-Workman*, 54 F.4th at 212; *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011); *Russell v. BSN Med., Inc.*, 721 F. Supp. 2d 465, 477 (W.D.N.C. 2010); *Jacobs v. North Carolina Admin. Off. of the Cts.*, 780 F.3d 562, 578 (4th Cir. 2015).

Plaintiff's retaliation claims center around three periods of time in which Plaintiff alleges he submitted complaints and subsequently experienced adverse employment actions: (1) October 2019–May 2020; (2) February 2021–June 14, 2021; and (3) June 14, 2021, to present. *See* ECF 1, at 10–14.

### 1.     October 2019–May 2020

First, Plaintiff alleges that "within days" of him complaining about discrimination in October 2019, Defendant issued Plaintiff a verbal corrective action on October 24, 2019, ECF 74-1, at 271; *see also* ECF 74-1, at 59–60 (including internal complaint submitted around October 9, 2019).

As discussed above, the Court finds the verbal corrective action on October 24, 2019, was not an adverse action as Plaintiff has not established that it had any effect on a term, benefit or condition of his employment. *See supra* Section III.A.1; *see also Thorn*, 766 F. Supp. 2d at 603 ("Many of these acts—such as . . . 'unwarranted reprimands,' amount to nothing more than unactionable 'personal slights.'" (citing *Adams v. Upper Chesapeake Med. Ctr.*, No. AMD 08–346, 2009 WL 997103, at *4 (D. Md. Apr. 14, 2009))). Next, Plaintiff claims that approximately one month after he submitted a complaint of discrimination in February 2020, ECF 74-1, at 65–75, he received a critical performance evaluation with "false comments about Plaintiff's work performance." *See* ECF 1, at 10–11 ¶ 50. However, Plaintiff fails to identify this critical performance evaluation in the record and makes no mention of what it entails in his declaration or deposition. ECF 73-13; ECF 71, at 11, 26 (citing only to Plaintiff's deposition, without further record citation); ECF 73-1, at 41, 161:10-13 (mentioning and identifying an "Exhibit 32" as the performance evaluation at issue, however, failing to attach the document as an exhibit). Given the lack of information surrounding the May 2020 work performance evaluation, the Court cannot evaluate such an alleged adverse action as part of Plaintiff's retaliation claim.[15]

### 2.  February 2021–June 14, 2021

Plaintiff next alleges that after he submitted a complaint on February 24, 2021, he was retaliated against by having his "work truck . . . [] taken from him," on June 14, 2021. ECF 1, at 12 ¶ 62. Plaintiff cites no caselaw supporting the claim that having to ride-share constitutes an adverse action. *See* ECF 71, at 14. Plaintiff merely asserts that "[t]hese actions altered the terms and conditions of Plaintiff's employment because they would have made his work performance

---

[15] In the alternative, Defendants argue that Plaintiff failed to establish a causal nexus given Plaintiff's numerous corrective actions before Plaintiff ever began complaining about discrimination. ECF 67-2, at 35–36; ECF 74-1, at 24–26 (June 4, 2019, verbal warning corrective action); ECF 73-1, at 171 (June 4, 2019, professional counseling corrective action).

more difficult." *Id.* (citing ECF 73-13, at 4 ¶ 13)." However, "not everything that makes an employee unhappy is an actionable adverse [employment] action." *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir.1997).

As noted above, numerous courts have held that an employment decision that merely makes work "more difficult" is not an adverse action. *See DeCesare*, 1999 WL 330258 *4 (holding assignment of more difficult work did not constitute a tangible employment action); *Davis*, 46 F. Supp. 3d at 234 (holding plaintiff's allegation that he was deliberately assigned a disproportionate number of African American and Hispanic inmates who were disruptive, was insufficient to establish an adverse action because "simply being assigned undesirable work duties . . . [is] insufficient to establish adverse employment action").

In any event Plaintiff has failed to demonstrate that requiring an employee in his position to ride-share would dissuade a reasonable employee from lodging a complaint of discrimination, ECF 67-2, at 37–38, when such ridesharing was a common practice. *See, e.g.*, ECF 73-3, at 5, 19:5–10 (testifying there are 60 employees and "not [] enough vehicles to personally assign to people, so [employees] often ride in groups of two to four"); *id.* at 19:14–17 ("[I]t was common knowledge that we shared vehicles. . . ."); *see also* ECF 73-1, at 166 ("In this industry and with our equipment you will often have to ride two men to a truck and help each other service our facilities."); ECF 73-1, at 21, 82:9–83:12 (acknowledging Plaintiff understood this policy).

The record contains evidence supporting the argument that Plaintiff had his own truck so often not because it was a term of employment, but because every other individual refused to ride with him. *See* ECF 74-1, at 38 (writing in a letter dated June 4, 2019, that "[e]very technician he has worked with has said that his is extremely confrontational and that they do not want to work with him anymore"); ECF 73-3, at 10, 37:7–11 ("The crews got frustrated trying to work and teach

with him. So it's easier for them a lot of times to try to push him on to another employee or they would come and write a complaint and ask for him to ride with somebody else."); ECF 74-3 (2021 Evaluation), at 95 ("Responds very negatively to constructive criticism. [Plaintiff] does not speak to other employees. All HVAC mechanics have requested him NOT to ride or be paired with them in the vehicle. (His negative, unprofessional and disrespectful attitude contributes to the problem)" (emphasis in original)). In any event, given that ridesharing was common practice, ECF 73-1, at 21, 82:9–83:12, ridesharing would not dissuade a reasonable employee from lodging a complaint of discrimination.

### 3.    June 14, 2021, to Present

Finally, Plaintiff alleges that on June 14, 2021, after he complained about discrimination he was "immediately suspended and ordered by Defendant to leave the workplace." ECF 1, at 14 ¶ 74. Defendant argues that being placed on administrative leave with pay is not an adverse employment action in this Circuit. ECF 67-2, at 38 (citing *Nzabandora v. Rectors & Visitors of Univ. of Va.*, 749 F. App'x 173, 175 (4th Cir. 2018)). In *Nzabandora*, a Fourth Circuit panel held that "placement on paid leave pending investigations into [a plaintiff's] alleged misconduct [] d[id] not constitute [an] adverse employment action for purposes of Title VII." *Id.* (citing *Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015), which held "[a] paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision"); *see also Jones*, 796 F.3d at 326 (collecting cases and noting the Second, Sixth, Fourth, Fifth, and Third Circuits have regarded paid administrative leave as not an adverse action); *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) (holding that "placing [an employee] on administrative leave with pay for a short time to allow investigation" is not an adverse action for retaliation purposes), *abrogated on other*

42

grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006). The Court agrees with Defendant that Plaintiff's placement on paid administrative leave was not an adverse action.

Even assuming *arguendo* that placing an employee on paid administrative leave for approximately three years constitutes an adverse action, and assuming Plaintiff's complaint about his truck was a protected activity even when Plaintiff knew a personal truck was not an entitlement of the job, Defendants have, nevertheless, established a legitimate, non-retaliatory reason for Plaintiff's administrative leave: Plaintiff made inappropriate comments against his supervisor that were perceived as threatening. *See* ECF 74-5, at 138–44 (sustaining allegation that Plaintiff made inappropriate statements to Mr. Schiemer). Plaintiff does not dispute what he said to Mr. Schiemer, but rather Plaintiff asserts he did not intend to threaten violence, only legal action. *Id.* at 133.

Defendants analogize this case to *Faulkenberry v. United States Department of Defense*, Civ. No. 22-01150-JMC, 2023 WL 3074639, at \*12 (D. Md. April 25, 2023). In *Faulkenberry*, an employee was placed on paid administrative leave after she commented that management "would have a bad day on Monday" and would "cross the Rubicon." *Id.* The plaintiff was placed on administrative leave for her perceived threat regarding management. *Id.* The Court held the plaintiff had failed to demonstrate her protected activity was the cause of her placement on administrative leave, given the defendant's legitimate rationale that the manager interpreted the statements as a threat given plaintiff was a decorated war veteran, and the court found that the plaintiff had failed to demonstrate pretext. *Id.* Drawing a parallel, Defendant argues that given Mr. Schiemer was aware of Plaintiff's history of "confrontational" and "aggressive" behavior toward other employees, that Mr. Schiemer genuinely interpreted Plaintiff's statement that he would "get [Mr. Schiemer] out of this office," while pointing his finger at him, as threatening.

ECF 67-2, at 41; *see also* ECF 74-1, at 23 (indicating by email that employees "all have the same concerns of him being very confrontational"); ECF 74-3, at 89 (receiving a complaint from Mr. Jones that Plaintiff is "very argumentative" and that Mr. Jones once felt "threatened" by Plaintiff); *id.* at 100 (receiving a complaint from Mr. Crooks that "on several occasions" Plaintiff demonstrated a "very aggressive attitude"). Plaintiff's behavior prompted one employee to email concerns related to workplace violence. *See id.* at 92 (receiving concern from Mr. Pinkard about Plaintiff's hostile attitude [that] is not conducive to a good working environment" due to his "multiple issues with other employees and management" and because "around the nation the potential for workplace violence has increased"). Plaintiff does not distinguish *Faulkenberry*, ECF 71, and the Court agrees with Defendant that just like in *Faulkenberry*, Defendant has provided a legitimate, non-retaliatory rationale for Plaintiff being placed on paid administrative leave.

Defendant next argues that Plaintiff cannot demonstrate pretext by comparing his treatment to that of Mr. Howell, whom Plaintiff alleged threatened him. ECF 67-2, at 41. Defendant notes that unlike Plaintiff, Mr. Howell had no history of conflicts with other employees prior to the incident involving Plaintiff, and Mr. Howell and Plaintiff had never had any prior conflicts with one another. *Id.* (citing ECF 74-3, at 4 ¶ 14 and ECF 73-1, at 44, 174:19–175:16). Mr. Fossett, former Chief Operating Officer for PGCPS, and Sam Stefanelli, Director of Building Services, investigated the complaint. ECF 74-4, at 2–3 ¶ 7. Dr. Fossett met with both Plaintiff and Mr. Howell. *Id.* Given that there were no witnesses and Mr. Howell "adamantly" denied making the statement, *id.* at 3–4 ¶ 9, Mr. Fossett did not believe there was any basis to impose disciplinary action, *id.* While Plaintiff argues this was a "sham" investigation and not as thorough as the investigation into his statement to Mr. Schiemer, the mere difference in investigations fails to demonstrate pretext when there were substantial differences in the two complaints. For instance,

44

no one contested Plaintiff's statement to Mr. Schiemer, ECF 74-5, at 133, and Mr. Howell *did* contest the claim that he threatened to shoot Plaintiff in the head. ECF 74-4, at 3–4 ¶ 9. Mr. Howell also had no complaints against him from co-workers, ECF 74-3, at 4 ¶ 14, while Plaintiff had numerous complaints of aggressive and threatening behavior. *See, e.g.;* ECF 74-3, at 89; ECF 74-1, at 23; ECF 74-3, at 92.

The only other evidence Plaintiff submits to show pretext is that there was a delay in investigating his initial October 14, 2019, internal complaint. ECF 71, at 29. Defendant points to the testimony of Jeffrey Carpenter, PGCPS's Director of Employee and Labor Relations, who attested that the delay in investigation was caused by the Covid pandemic, as well as staffing and leadership turnover which affected Plaintiff's case, as well as other cases. ECF 73-2, at 10, 37:9–38:6.

Viewing the evidence in total, and even in a light most favorable to Plaintiff, Plaintiff has failed to generate a genuine issue of material fact as no reasonable jury could determine that he was retaliated against on the basis of his complaints of discrimination. The evidence suggests that the employment actions at issue were taken for reasons other than Plaintiff's race or nationality, and not because Plaintiff raised complaints in that regard. Counts VI, VIII, IX, XI, XII, and XIV are dismissed.[16]

---

[16] As Plaintiff has failed to state a retaliation claim under Title VII, the Court also dismisses Plaintiff's § 1981 claims. *Spriggs v. Pub. Serv. Comm'n of Md.,* 197 F. Supp. 2d 388, 398 (D. Md. 2002) ("Because I have granted defendant's motion as to plaintiff's Title VII claims, I will grant defendant's motion as to plaintiff's § 1981 claims as well.").

## IV.   **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

Plaintiff is granted fourteen (14) days to move to reconsider the dismissal of Count XIX.

A separate implementing Order will issue.

Dated: July 2, 2024                                    /s/
                                                Brendan A. Hurson
                                                United States District Judge

46